# Commonwealth v. 6066 Buckingham Drive

*Richard E. Patton, assistant district attorney,* for the commonwealth.

*John C. Marston,* for defendant.

BIEHN, *J.,* June 27, 1989 — This is a forfeiture proceeding in which the commonwealth seeks forfeiture of $2,240 in cash and a residential property at 6066 Buckingham Drive, Bensalem, Pennsylvania. A hearing was held before this court on May 8, 1989. For reasons stated below, we determine that the money must be forfeited to the commonwealth; however, the residential property shall be returned.

At the hearing, it was established that Barbara Bik Pellack (hereinafter Bik) purchased the property in question while she was single from a portion of substantial funds she had acquired from her parents' estate. At some time in 1986, Bik met Joseph Pellack (hereinafter Pellack), and shortly thereafter he moved into her house. On September

1, 1986, Bik and Pellack exchanged marriage vows on the island of Kauia in Hawaii. Bik testified that she said, "I take you, Joe, as my husband." He said, "I take you, Barbara, as my wife. I will love, honor and cherish you until death do us part." On March 31, 1987, a deed was signed transferring the property on Buckingham Drive from "Barbara D. Pellack (formerly Barbara D. Bik) to Barbara D. Pellack and Joseph J. Pellack, husband and wife as tenants by the entireties."

In August 1987, Bik was arrested on the premises for possession of heroin, along with another woman named Joanne Dupell. Pellack had reported them to the police. Bik testified that Pellack was against her use of drugs and several times called the police as well as discarded any substances he found around the house.

Bik did not return to the house for several months after her arrest. Pellack lived in the house. When she did return along with some friends who were also using heroin, Pellack remained at the house for only a short time and then moved out. Bik returned to the house in November 1987; Pellack moved out in December. In January 1988, Pellack moved to California.

On August 31, 1988, Bik was arrested for delivering 14 bags of heroin to an undercover Bensalem Township police officer inside the premises in question. A search of the house disclosed some $2,200 in a brown envelope in a kitchen cabinet separate and apart from where drugs and paraphernalia were found. Bik testified that the money came from a $5,000 cash withdrawal from her bank account on August 15, 1988. This money was also a portion of the funds received from her parents' estate.

The first issue we shall address is the forfeiture of the money. The applicable law is as follows:

"§6801. Loss of property rights to commonwealth —

"(a) *Forfeitures generally* — The following shall be subject to forfeiture to the commonwealth and no property right shall exist in them:

. . .

"(6)(i) All of the following:

"(A) Money, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of The Controlled Substance, Drug, Device and Cosmetic Act, and all proceeds traceable to such an exchange.

"(B) Money, negotiable instruments, securities or other things of value used or intended to be used to facilitate any violation of The Controlled Substance, Drug, Device and Cosmetic Act." 42 Pa.C.S. §6801.

At the hearing, Bik testified as follows concerning the money:

(By Mr. Marston)

Q: . . . Now, Barbara, when you took five thousand out of the bank two weeks before your arrest, what was it for?

A: I intended to pay bills with it.

Q: What did you do with it?

A: I ended up spending it on money for drugs.

Q: What denominations did you receive from the bank?

A: Fifties and hundreds.

Q: And over the two weeks from when you made the withdrawal to when you were arrested, what did you spend it on?

A: It went for drug money.

Q: What kind of drugs?

A: Heroin.

Q: Were you a heroin addict at that time?

A: Yes, I was.

Q: And did you manage to divert any of this money to the payment of bills?

A: Maybe a few small bills here and there, but the large amounts went towards drug money for every day.

Q: And before August 15 had you made any similar withdrawals from your estate accounts?

A: Yes, I did.

Q: When was the last one before August 15?

A: About the end of July.

Q: How much did you take out of your accounts then?

A: Seventy-five hundred dollars.

Q: And what did you use those funds for?

A: That all went to drugs as well.

Q: Did you buy drugs for other people, too?

A: Yes, I did.

It is clear from the above that the money withdrawn from Bik's bank account was used and intended to be used to buy heroin, an obvious violation of The Controlled Substance, Drug, Device and Cosmetic Act. Consequently, it must be forfeited to the commonwealth.

Next, we address the question concerning the residential property. The commonwealth argues that as to Bik the property is clearly forfeitable and that Pellack cannot contest the forfeiture because he and Bik are not married.

Amendments to the Pennsylvania forfeiture law which went into effect on June 30, 1988 expanded the provision pertaining to the forfeiture of real property. Previously, real property could be forfeited when used as "consideration." Now, the act reads as follows:

"§6801. Loss of property rights to commonwealth —

"(a) *Forfeitures generally* — The following shall be subject to forfeiture to the commonwealth and no property right shall exist in them:

. . .

"(6)(i) All of the following:

. . .

"(C) Real property used or intended to be used to facilitate any violation of The Controlled Substance, Drug, Device and Cosmetic Act, including structures or other improvements thereon, and including any right, title and interest in the whole or any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of The Controlled Substance, Drug, Device and Cosmetic Act, and things growing on, affixed to and found in the land.

"(ii) No property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by the owner to have been committed or omitted without the knowledge or consent of that owner." 42 Pa.C.S. §6801.

Section 6802, which sets forth the general procedure for the forfeiture of property, includes the following:

"(j) *Owner's burden of proof* — At the time of the hearing, if the commonwealth produces evidence that the property in question was unlawfully used, possessed or otherwise subject to forfeiture under section 6801(a), the burden shall be upon the claimant to show:

"(1) That the claimant is the owner of the property or the holder of a chattel mortgage or contract of conditional sale thereon.

"(2) That the claimant lawfully acquired the property.

"(3) That it was not unlawfully used or possessed by him. In the event that it shall appear that the property was unlawfully used or possessed by a person other than the claimant, then the claimant shall show that the unlawful use or possession was without his knowledge or consent. Such absence of knowledge or consent must be reasonable under the circumstances presented." 42 Pa.C.S. §6802.

We agree with the commonwealth that as to Bik, the property is forfeitable.[1] She used the property to facilitate a violation of The Controlled Substance, Drug, Device and Cosmetic Act, that is, she delivered 14 bags of heroin to an undercover police officer at the subject premises. However, Pellack has raised the "innocent owner" defense. This leads to two questions that we must consider. First, did Bik and Pellack have a common-law marriage that would support Pellack's right to contest forfeiture? Second, did Pellack have knowledge of the unlawful use of the property and if not, was his absence of knowledge reasonable under the circumstances?

As to the first question:

"Common-law marriage is still valid in Pennsylvania. An essential element for a common-law marriage is intent to establish a marital relationship. Evidence of intent may consist of words uttered in the present tense with a view and for the purpose of establishing the relation of husband and wife. Although the use of verba de praesenti in entering

---

1. The defense concedes that Bik's conduct in August 1988 satisfies the new amendments as to forfeiture.

into a marriage contract is not essential, *In re Estate of Stauffer,* 504 Pa. 626, 476 A.2d 354 (1984), cohabitation and reputation of marriage do not create a marriage, but are only mere circumstances from which a marriage may be presumed and rebutted by other facts and circumstances. Furthermore, where a relationship is meretricious in its inception, there must be clear evidence of change in status to rebut the presumption that the nonmarriage continued after the impediment to marriage was removed." *Steadman v. Turner,* 357 Pa. Super. 361, 365, 516 A.2d 21 (1986). (citations omitted)

Bik testified that she and Pellack exchanged marriage vows in September 1986. They twice applied for a marriage license although they never obtained one. Her testimony continued as follows:

Q: And before you went to Hawaii did you and Joe apply for any particular type of application or license?

A: Yes, we applied for a marriage license.

Q: Where did you make that application for a marriage license?

A: At Judge Ritter's in Bensalem.

Q: Okay. And were blood tests required?

A: Yes, they were.

Q: And did you and Joe plan on having a church-type wedding?

A: Well, we did. However, I didn't want a big wedding because I really don't have any family. His family wanted a big wedding, and I wanted to keep it small and simple, however very special.

Q: What did you guys decide on?

A: We decided to take a trip to Hawaii. We had found out from the neighbors that there was a special place in Hawaii where you could go to get

married and exchange vows, and that is what we intended to do while we were there.

Q: Did you do that?

A: Yes, we did.

Q: On what date did you exchange vows?

A: September 1, 1986.

The above testimony is clear evidence of the couple's intent to establish the relationship of husband and wife. The commonwealth argues, however, that it is self-serving and being the only evidence before the court, we should find that no marriage existed. We disagree. Although the above testimony was favorable to Bik and Pellack, Bik was a credible witness who made several statements against her own interests. In addition, other evidence was presented to this court.

Six months after Bik and Pellack returned from Hawaii, Bik transferred the property to herself and Pellack as tenants by the entireties.[2] They continued to reside in the house together until Bik was arrested in August 1987. Frank Hogg, a witness who knew Pellack, testified that he believed Bik and Pellack were married. He stated, "Well, when we were over there, he talked about his wife. I can remember that." Based on all of the above, we find that a common-law marriage existed between Bik and Pellack. Accordingly, Pellack is an owner of the

2. "A tenancy by the entireties is a unique form of co-ownership grounded in the common-law concept that husband and wife were but one legal entity. It exists when property, either real or personal, is held jointly by a husband and wife, with its essential characteristic being that each spouse is seised of the whole or the entirety and not a divisible part thereof. Neither spouse in a tenancy by the entireties may independently appropriate property to his or her own use to the exclusion of the other, and neither spouse, acting independently, may sever the estate by, for example, conveying part of the property away." *Clingerman v. Sadowski*, 513 Pa. 179, 183, 519 A.2d 378, 380-1 (1986). (citations omitted) (footnote omitted)

property in question and lawfully acquired it when Bik transferred the property to herself and Pellack as tenants by the entireties.

It is clear from the evidence presented at the hearing that the property was not unlawfully used or possessed by Pellack. The only questions that remain to be considered are whether or not the unlawful use of the property by Bik was without Pellack's knowledge or consent and whether or not such absence of knowledge or consent was reasonable under the circumstances.

The only unlawful use of the property by Bik that can support forfeiture is that which took place after June 30, 1988, the date on which the amendments to the forfeiture law went into effect. When Bik delivered the 14 bags of heroin to an undercover police officer on August 31, 1988, Pellack was in California where he had been since January of that year. Pellack never gave permission for the sale of drugs nor did he know that they were being sold on the premises. There was no evidence that any controlled substance was sold on the premises until after Pellack left for California. Prior to his leaving, Pellack did have knowledge that Bik was using drugs. Evidence showed that this was without his consent and that he did what he could to prevent the situation, that is he informed the police as well as discarded substances that he found around the house.

We believe it is a close question as to whether Pellack's absence of knowledge was reasonable under the circumstances. We find that it is. However, we recognize that it may be possible to reach the opposite conclusion in this case, with reputable authority to support it. The forfeiture of a residential property is a drastic step, and under the facts and circumstances presented to this court, we are not

inclined to take such a step. Bik was a credible witness. She testified to her marriage to Pellack and to his actions regarding her involvement with drugs. We find that Pellack has met his burden of proof as to his "innocent owner" defense.

Accordingly, we enter the following

### ORDER

And now, June 27, 1989, after hearing, it is hereby ordered and directed that the petition for forfeiture is granted as to the $2,240 and denied as to the property at 6066 Buckingham Drive, Bensalem, Pa.